No. 23-13252

---

**UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

---

JAKETRA BRYANT,

Plaintiff-Appellant,

v.

CALVARY CHRISTIAN SCHOOL OF COLUMBUS GEORGIA INC.,

Defendant-Appellee.


On Appeal From The United States District Court for the
Middle District of Georgia
C.A. No. 4:21-CV-00205-CDL; Honorable Clay D. Land

---

**INITIAL BRIEF OF APPELLANT**

---

Rebecca Woods
*rwoods@seyfarth.com*
Seth J. Fortin
*sfortin@seyfarth.com*
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3958
(404) 885-1500

*Attorneys for Appellant*

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1, Plaintiff-Appellant Jaketra Bryant discloses

the following known interested parties:

1.  Land, Clay D., United States District Judge, Middle District of Georgia.

2.  Bryant, Jaketra, Plaintiff-Appellant.

3.  Woods, Rebecca, attorney for Plaintiff-Appellant.

4.  Fortin, Seth J., attorney for Plaintiff-Appellant.

5.  Seyfarth Shaw LLP, attorneys for Plaintiff-Appellant.

6.  Calvary Christian School of Columbus Georgia Inc., Defendant-Appellee.

7.  Sauls, Reagan G., attorney for Defendant-Appellee.

8.  Daniel, Jeffrey R., attorney for Defendant-Appellee.

9.  Parker Poe, attorneys for Defendant-Appellee.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Jaketra Bryant requests oral argument in this case alleging that her son's school engaged in disability and race discrimination when it expelled the boy, who has autism spectrum disorder and ADHD, for certain nonviolent behavioral issues.

Oral argument is warranted in this case because the case involves important issues of law that are likely to recur. In particular, a key issue in the case is whether a district court must defer to a school's disciplinary decisions when deciding whether the school should have made reasonable accommodations for a disabled student—or in other words, whether a school's interest in enforcing its own view of discipline is paramount even over the requirement to make reasonable accommodations for a disabled child. This is an important issue that has come up before and will almost certainly come up again in this circuit. *See, e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1206 (9th Cir. 2016) (finding "an issue of material fact as to whether accommodations . . . would have helped" a student with behavioral issues stay in her school). Oral argument will allow the Court to fully explore the weighty considerations involved with informed counsel for both sides.

The case also involves a complex and somewhat challenging factual record, including medical reports, competing recollections about the order of events, and

sometimes opaque school records. Oral argument will enable the Court to question

counsel to gain clarity on that record.

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ................................................................. 3

STATEMENT OF THE CASE .................................................................... 5

      A.    Nature of the Case ........................................................... 5

      B.    Facts Relevant to the Issues Submitted for Review ............................ 5

      C.    Relevant Procedural History ............................................ 10

      D.    Rulings Presented for Review ........................................... 12

      E.    Standard of Review .......................................................... 13

SUMMARY OF THE ARGUMENT ........................................................ 14

ARGUMENT AND CITATIONS OF AUTHORITY ............................... 17

  I.     DISABILITY DISCRIMINATION .............................................. 17

      A.    The District Court Correctly Found That C.B. Has a Disability ....... 18

      B.    The District Court Erred in Its Analysis of Whether C.B. Was an "Otherwise Qualified" Student ........................................ 19

          1.Determining Whether Bryant's Requested Accommodations Were Reasonable Is Province of Jury ........................................ 19

          2.School Administrators' Disciplinary Decisions Are Not Exempt from the Requirements of Disability Law ................................. 24

          3.Requiring Transfer to Another School Is Not Reasonable Accommodation .............................................................. 29

  II.    race discrimination ....................................................................... 31

      A.    The District Court Correctly Held Ms. Bryant and Calvary Were in a Contractual Relationship ..................................... 31

      B.    The District Court Erred In Finding No Direct Evidence of Race Discrimination ................................................................ 32

      C.    The District Court Erred In Rigidly Applying *McDonnell Douglas* to the Evidence of Race Discrimination ................................... 34

D.    A Jury Could Find Calvary's "Discipline" Explanations Pretextual.38

III.   CREATION OF A Racially Hostile Environment .....................................43

A.    Interplay of Race and Disability. .......................................................47

CONCLUSION ........................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. v. Paradise Valley Unified Sch. Dist. No. 69*,
   815 F.3d 1195 (9th Cir. 2016) ..................................................................3, 27, 28

*Alexander v. Choate*,
   469 U.S. 287 (1985).........................................................................................30

*Alvarez v. Royal Atl. Devs., Inc.*,
   610 F.3d 1253 (11th Cir. 2010) .......................................................................39

*Ash v. Tyson Foods, Inc.*,
   664 F.3d 883 (11th Cir. 2011) .........................................................................40

*W.H. ex rel. B.H. v. Clovis Unified Sch. Dist.*,
   No. CV F 08-0374 LJO DLB, 2009 WL 1605356 (E.D. Cal. June
   8, 2009) (E.D. Cal. Sept. 10, 2009) .................................................................28

*Beasley v. O'Reilly Auto Parts*,
   69 F.4th 744 (11th Cir. 2023) ..........................................................................13

*Brennan v. Stewart*,
   834 F.2d 1248 (5th Cir.1988) ..........................................................................20

*C.B. v. Moreno Valley Unified Sch. Dist.*,
   No. EDCV210194JGBSPX, 2023 WL 8044361 (C.D. Cal. Oct. 13,
   2023) .................................................................................................................25

*Chambers v. City of Lakeland*,
   No. 8:20-CV-2794-JLB-SPF, 2022 WL 2356816 (M.D. Fla. June
   30, 2022) .....................................................................................................45, 46

*Chambers v. City of Lakeland*,
   No. 8:20-CV-2794-TPB-SPF, 2021 WL 1428494 (M.D. Fla. Apr.
   15, 2021) ...........................................................................................................46

*Chen v. Yellen*,
   No. 3:14-CV-50164, 2021 WL 4226202 (N.D. Ill. Sept. 16, 2021),
   *aff'd*, No. 21-3110, 2023 WL 2967428 (7th Cir. Apr. 17, 2023) .....................46

*Chisolm v. McManimon*,
275 F.3d 315 (3d Cir. 2001) ................................................................21

*Cleveland v. Home Shopping Network, Inc.*,
369 F.3d 1189 (11th Cir. 2004) ...................................................14, 38

*Dadian v. Vill. of Wilmette*,
269 F.3d 831 (7th Cir. 2001) ...............................................................21

*Damon v. Fleming Supermarkets of Fla., Inc.*,
196 F.3d 1354 (11th Cir. 1999) ...........................................................32

*E.E.O.C. v. Beverage Canners, Inc.*,
897 F.2d 1067 (11th Cir. 1990) ...........................................................33

*Fennell v. Marion Indep. Sch. Dist.*,
804 F.3d 398 (5th Cir. 2015) ........................................................44, 45

*Frappied v. Affinity Gaming Black Hawk, LLC*,
966 F.3d 1038 (10th Cir. 2020) ...........................................................47

*Freeman v. Cavazos*,
939 F.2d 1527 (11th Cir. 1991) ...........................................................20

*Goldberg v. Fla. Int'l Univ.*,
838 F. App'x 487 (11th Cir. 2020) .......................................................20

*Halpern v. Wake Forest Univ. Health Scis.*,
669 F.3d 454 (4th Cir. 2012) ...............................................................25

*Harrington v. Cleburne Cnty. Bd. of Educ.*,
251 F.3d 935 (11th Cir. 2001) .............................................................47

*Harris v. Maricopa Cnty. Superior Ct.*,
631 F.3d 963 (9th Cir. 2011) ...............................................................48

*Hawkins v. Sarasota Cnty. Sch. Bd.*,
322 F.3d 1279 (11th Cir. 2003) ...........................................................44

*Holly v. Clairson Indus., L.L.C.*,
492 F.3d 1247 (11th Cir. 2007) ...........................................................22

*Hunt v. Aimco Properties, L.P.*,
  814 F.3d 1213 (11th Cir. 2016) ..........................................................25

*Jefferies v. Harris Cnty. Cmty. Action Ass'n*,
  615 F.2d 1025 (5th Cir. 1980) ............................................................47

*Jefferson v. Sewon Am., Inc.*,
  891 F.3d 911 (11th Cir. 2018) ............................................................32

*Joseph M. v. Becker Coll.*,
  531 F. Supp. 3d 383 (D. Mass. 2021) .................................................28

*L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch.
  Dist.*,
  55 F.4th 1296 (11th Cir. 2022) ...........................................................30

*Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999).....................................................................26, 44

*Lewis v. City of Union City*,
  918 F.3d 1213(11th Cir. 2019) (en banc) ...........................................36

*Lloyd v. Holder*,
  2013 WL 6667531 (S.D.N.Y. Dec. 17, 2013) ....................................45

*Lockett v. Target Corp.*,
  No. 3:20-CV-00191 (SVN), 2022 WL 17127292 (D. Conn. Nov.
  22, 2022) ............................................................................................46

*May v. Nygard Holdings Ltd.*,
  203 F. App'x 949 (11th Cir. 2006).....................................................14

*McCray v. Westrock Servs., LLC*,
  No. CV219853DMGRAOX, 2023 WL 4681371 (C.D. Cal. July
  12, 2023) ............................................................................................50

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)......................................................................*passim*

*McGregor v. Louisiana State Univ. Bd. of Sup'rs*,
  3 F.3d 850 (5th Cir. 1993) ............................................................21, 24

*Merritt v. Dillard Paper Co.*,
   120 F.3d 1181 (11th Cir.1997) ........................................................ 32

*Ossmann v. Meredith Corp.*,
   82 F.4th 1007 (11th Cir. 2023) ....................................................... 42

*Pena v. Clark Cnty.*,
   No. 3:21-CV-05411-DGE, 2023 WL 3293093 (W.D. Wash. May
   5, 2023) ........................................................................................... 46

*Rice–Lamar v. City of Fort Lauderdale*,
   232 F.3d 836 (11th Cir.2000) ......................................................... 34

*Saulter v. Corizon Health, Inc.*,
   No. 5:16-CV-333-MCR-GRJ, 2018 WL 11491441 (N.D. Fla. Mar.
   26, 2018) ......................................................................................... 21

*Sch. Bd. of Nassau Cnty., Fla. v. Arline*,
   480 U.S. 273 (1987) ........................................................................ 20

*Smith v. Lockheed-Martin Corp.*,
   644 F.3d 1321 (11th Cir. 2011) ...................................................... 36

*Southeastern Cmty. Coll. v. Davis*,
   442 U.S. 397 (1979) ............................................................ 20, 24, 45

*Stutts v. Freeman*,
   694 F.2d 666 (11th Cir. 1983) ........................................................ 25

*Thompkins v. Morris Brown Coll.*,
   752 F.2d 558 (11th Cir. 1985) ........................................................ 33

*Thompson v. Metro. Multi-List, Inc.*,
   934 F.2d 1566 (11th Cir. 1991) ................................................. 14, 50

*Turner v. Hershey Chocolate U.S.*,
   440 F.3d 604 (3d Cir. 2006) ........................................................... 21

*Tynes v. Fla. Dep't of Juv. Just.*,
   88 F.4th 939 (11th Cir. 2023) ............................................. 35, 36, 37

*Venters v. City of Delphi*,
   123 F.3d 956 (7th Cir. 1997) .......................................................... 33

*Wolfe v. Fla. Dep't of Corr.*,
   No. 5:10-CV-663-OC-PRL, 2012 WL 4052334 (M.D. Fla. Sept.
   14, 2012) ............................................................................................21

**Statutes**

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

29 U.S.C. § 705 ..............................................................................................18

29 U.S.C. § 794 ...............................................................1, 11, 15, 19, 20, 26

42 U.S.C. § 12102(1)(A) ................................................................................18

Civil Rights Act of 1866, 42 U.S.C. § 1981 .......................................*passim*

Civil Rights Act of 1964 Title VI, 42 USC § 2000d, et. seq ..........................*passim*

**Other Authorities**

Fed. R. App. P. 28(a)(4) ..................................................................................1

## STATEMENT OF JURISDICTION

Pursuant to Fed. R. App. P. 28(a)(4), Plaintiff-Appellant Jaketra Bryant states as follows:

A.    The district court had federal question jurisdiction over the case under 28 U.S.C. § 1331, because the action arises under laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, et. seq; the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Rehabilitation Act, 29 U.S.C. § 794.

B.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291, which provides that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." On August 7, 2023, the district court issued an order granting Defendant's Motion for Summary Judgment. Dkt. No. 63. The order disposed of all of Plaintiff's claims and was followed by a Judgment. Dkt. No. 64. Thus, the Court has jurisdiction over this appeal from the final decision of the District Court.

C.    This appeal is timely because a Notice of Appeal was filed on October 3, 2023. On September 1, 2023, well in advance of when her Notice of Appeal was due, Plaintiff filed a motion for an extension of time to file the Notice. Dkt. No. 65. On September 5, 2023 the district court granted that motion, extending the filing

1

deadline to October 6, 2023. Dkt. No. 66. Thus, the Notice was timely filed and this appeal is timely.

D.    As discussed above in part B, the appeal is from a final order or judgment that disposes of all parties' claims. The summary judgment order disposed of Plaintiff's claims, and there were no other claims at issue in the lawsuit.

## STATEMENT OF THE ISSUES

A.    Under the Rehabilitation Act, where a school expelled a student for behavioral issues notwithstanding the availability of a reasonable accommodation that would ameliorate the behavior, did the district court err in granting summary judgment to the school on the ground that the school was not required to alter its disciplinary policies to accommodate a student with behavioral issues and the court could not second-guess such disciplinary decisions?

B.    Did the district court err in granting summary judgment on Appellant's racial discrimination claim under 42 U.S.C. § 1981 by rigidly applying the *McDonnell Douglas* burden-shifting paradigm rather than the proper summary judgment standard, which allows for proof of discrimination by a "convincing mosaic" of evidence?

C.    Did the district court err in granting summary judgment on Appellant's racial discrimination claim under 42 U.S.C. § 1981, given the substantial evidence of pretext in the record?

D.    Did the district court err in granting summary judgment on Appellant's hostile environment claim under Title VI of the Civil Rights Act by incorrectly holding that the racial harassment in the school was not of a great enough magnitude to deny Appellant's son equal access to education,

3

notwithstanding the observable correlation between the period of harassment and the exacerbation of the son's disability-related behaviors?

## STATEMENT OF THE CASE

### A.    Nature of the Case

In this case, Appellant Jaketra Bryant alleges that her son's school, Appellee Calvary, discriminated against her son as to both disability and race. As to disability, the school failed to allow C.B. reasonable accommodations in order to deal with minor, non-violent behavior problems related to his disability. As to race, staff of the school both discriminated directly against C.B., singling him out for harsh or disparaging treatment, and allowed a culture of racial hostility to flourish, both among the students and, more subtly, among teachers and administrators. The district court granted the school summary judgment and all claims, which Ms. Bryant seeks to reverse.

### B.    Facts Relevant to the Issues Submitted for Review

C.B. is a black teenaged boy. (Dkt. No. 59-40, Aff. J. Bryant ¶ 2.) He was 11-13 years old when he attended Calvary. (*Id.*) C.B. has been tested by a psychiatrist and diagnosed with autism and ADHD. (*Id.* ¶¶ 3, 9; Dkt. No. 60-24, Report of Dr. Weis.)

C.B. enrolled at Calvary in fall 2019. During his first year at Calvary, using certain behavioral incentives and a "positive behavior chart" administered by his teacher Mrs. Mixon, C.B. was doing well and making improvements academically. (Dkt. No. 59-40, Aff. J. Bryant ¶¶ 11-14; (Dkt. No. 49-3, Bryant Depo. Tr. at 269:3-16.) His homeroom teacher, for example, "had no problems with C.B." (Dkt.

No. 59-40, Aff. J. Bryant ¶ 15.) He was on the honor roll and received a "Faithful Worker Award." (*Id.* ¶ 21.)

The following year, however, Calvary placed C.B. in the classroom of another teacher, Ms. Cameron, rather than with Mrs. Mixon. (*Id.* ¶ 16.) Ms. Cameron "rarely" used the positive behavior chart or provided C.B. with incentives toward good behavior. (*Id.*) Ms. Cameron "was especially critical of C.B." and "disregarded his need for accommodations." (*Id.* ¶ 32.)

This was the 2020-21 school year—the year of the "racial reckoning," Black Lives Matter, and a culturally contentious election. C.B. began experiencing harassment by white students, including "a lot of racial comments," and other students telling C.B. that God hates black people. (Dkt. No. 49-3, Bryant Depo. Tr. at 298:1-5, 300:19-24; Dkt. No. 59-40, Aff. J. Bryant ¶ 26.) He also experienced repeated conflict with Ms. Cameron, though not with other teachers. As Ms. Bryant personally observed, Ms. Cameron treated C.B. differently from white students, ignoring him, answering questions for other students differently, speaking slowly to him, and needling him about being on medication. (Dkt. No. 49-3, Bryant Depo. Tr. at 283:16-284:22.) Ms. Bryant contacted school administrators and asked them to step in and deal with the discriminatory environment in Ms. Cameron's class and the school at large; officials did nothing. (*Id.* at 294:17-302:10; 299:20-300:6, 300:25-301:8; Dkt. No. 59-40, Aff. J. Bryant ¶ 26.)

6

School officials also frequently behaved inappropriately toward Ms. Bryant and C.B. in a manner demonstrating racial hostility. Ms. Cameron, for example, inappropriately intruded on Ms. Bryant's vehicle and personal space, leaning in to touch part of her car in order to make a sarcastic "knock wood" joke about C.B.'s ability to make continued progress at school. (Dkt. No. 49-3, Bryant Depo. Tr. at 285:16-24.) Ms. Smith commented about C.B. that "I let him in because I just absolutely just love you," which Ms. Bryant experienced as patronizing in the manner of a white person saying "I love black people. I've got a black friend." (*Id.* at 289:16-290:3.) Ms. Jones, Director of the school's Discovery Program, went even further, stating that C.B. would end up "with his hands behind his back" (i.e., in handcuffs) and that school officials were "now afraid for our lives"—suggesting that C.B., who was twelve, would live up to the stereotype of young black men as dangerous and criminal. (*Id.* at 287:7-11.)

C.B.'s disability occasionally manifested through disruptive behavior in class during moments of frustration, including throwing or slamming objects. Official school records list three incidents, all within a two-month period in late 2020.[1] (Dkt. No. 59-23, Official School Records, at p. BRYANT000177.) In one

---

[1] Both Mr. Koan and Ms. Bryant, when deposed, were aware of just one other incident, in 2019, involving a trash can. (Dkt. No. 49-7, Koan Depo. Tr. at 33:6-8; Dkt. No. 49-3, Bryant Depo. Tr. at 249:6-250:17.) Calvary also submitted an informal "log" of other alleged incidents as well as meetings and communications with Ms. Bryant. (Dkt. No. 59-24.) This self-serving document is hearsay on its face and does not appear to be a regularly kept business record. Thus it likely would not be admissible at trial. The district court appears to have disregarded that

instance he threw a pencil across the room, another time he slammed down either his laptop or the lid of the laptop, and a third time he threw a calculator. (Dkt. No. 49-5, Cameron Depo. Tr. at 21:2-24:9; Dkt. No. 49-3, Bryant Depo. Tr. at 250:15-22, 198:22-200:23.) There is no evidence in the record that any of the items were damaged; the calculator came apart but was able to be put back together. (Dkt. No. 49-5, Cameron Depo. Tr. at 23:23-24:9; Dkt. No. 49-7, Koan Depo. Tr. at 35:23-36:6.) There is also no evidence that C.B. ever threw anything *at* anyone, ever intended to hit or hurt anyone, or ever did hit or hurt anyone. (Dkt. No. 49-5, Cameron Depo. Tr. at 21:2-25; Dkt. No. 49-7, Koan Depo. Tr. at 34:14-35:22.)

The school subjected C.B. to increasingly harsh discipline in fall 2020. "After a pencil-throwing incident on October 8, 2020, Principal Marinda Smith suspended C.B. for three days. After a calculator-throwing incident in November 2020, Headmaster Jim Koan later decided not to allow C.B. to return to the classroom[.]" (Dkt. No. 49-6, Jones Decl. ¶ 23.) Instead, C.B. was forced to do remote learning.

In November 2020, noting that it was only in the poor environment in Ms. Cameron's classroom that C.B. was having these behavioral difficulties, Ms.

---

document in rendering its judgment. (Order at 20 ("Accordingly, **putting aside C.B.'s more extensive disciplinary history that was not formally recorded** . . . .") (emphasis added).)

Bryant requested that C.B. be transferred to a different classroom. (Dkt. No. 59-40, Aff. J. Bryant ¶ 36.) That request was denied.

Throughout this period, Ms. Bryant continued to meet with school officials, who assured her that C.B. would be returning to in-person instruction in February 2021. (Dkt. No. 59-40, Aff. J. Bryant ¶ 40.) At the express request of the school (Dkt. No. 49-2, Koan Decl. ¶ 17), Ms. Bryant consulted a board-certified behavioral analyst, Kya Williams, who created a plan to provide C.B. applied behavioral analysis ("ABA") services in the classroom setting, "such as assistance in de-escalation and behavioral therapy." (Dkt. No. 49-8, Williams Depo. Tr. at 78:1-79:7; Dkt. No. 59-40, Aff. J. Bryant ¶ 45.) Ms. Williams offered Calvary "her in-school services free of charge." (*Id.*) Ms. Williams averred that her team had methods for minimizing disruption and that they could "fade" the ABA interventions over time, leaving CB able to function independently. (Dkt. No. 50-1, Williams Depo. Tr. at 203-204.)

While C.B. was engaged in remote learning, there were no more incidents of so-called "property destruction," and the worst Mr. Koan could say about C.B.'s behavior at that point was that he was sometimes "disengaged" or distracted during remote learning and missed "a few" sessions with his teacher. (Dkt. No. 49-2, Koan Decl. ¶ 16.)

Nonetheless, in December 2020, Mr. Koan decided to expel C.B. for good. (*Id.* at ¶ 21.) He did not, however, immediately convey this to Ms. Bryant, who was under the impression, in January 2021, that C.B. would be returning to class with Ms. Williams' team assisting him. (Dkt. No. 59-14, Email exchange between Bryant and staff (Jan. 29, 2021).) Mr. Koan and Calvary refused to allow Ms. Williams to conduct classroom-based ABA at Calvary. Instead, Mr. Koan demanded that C.B. and Ms. Williams "successfully complete[] ABA therapy in a classroom setting **at another school**" before he could be allowed back. (Dkt. No. 49-2, Koan Decl. ¶ 20 (emphasis added).)

Since the expulsion, C.B. has been able to flourish in a different learning environment, Sylvan Learning. Away from Ms. Cameron's classroom and with proper therapeutic assistance, "C.B. is not disruptive, plays well with his peers, and gets along with everyone at Sylvan. C.B. has not had any incidents of misbehavior in the last two and a half years of teaching of him." (Dkt. 59-43, Aff. J. Elver ¶¶ 11-12.)

## C.    Relevant Procedural History

On November 16, 2021, Ms. Bryant filed a complaint in the District Court for the Middle District of Georgia, alleging direct racial discrimination in violation of 42 U.S.C. § 1981, a racially hostile learning environment in violation of Title VI of the Civil Rights Act of 1964, as amended, 42 USC § 2000d, *et seq.*, and

disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794. (Dkt. No. 1, Complaint.)

After discovery, on March 7, 2023, Calvary moved for summary judgment, arguing that: a) the Section 1981 claim failed because there had been no impairment of contract rights and there was no evidence of discriminatory intent on the school's part; b) the Title VI claim failed because the harassment was not "severe" enough, did not interfere with C.B.'s learning, and was not the result of "deliberate indifference" on the part of school officials; and c) that the Rehabilitation Act claim failed because C.B. did not have a "disability" under the statutory definition, he was not a "qualified" student because of his behavior, the school's disciplinary actions were legitimate, and the school was not required to provide reasonable accommodations for C.B. because these would have amounted to "special treatment." (Dkt. No. 49-10, Defendants' Brief ISO MSJ.)

Ms. Bryant responded on March 24, 2023, arguing, among other things, that the record contained sufficient evidence of pervasive racial harassment and the school's deliberate indifference, as well as evidence from which a jury could conclude that the staff themselves had discriminatory animus, contributed to the harassing environment, and singled C.B. out for unfair treatment. She further argued that C.B.'s behavioral issues were the result of his disabilities, that the school knew he had such disabilities, and that the school refused to reasonably

accommodate C.B.'s disabilities by allowing a behavioral therapist to work with C.B. in the classroom for a short duration to teach him de-escalation and coping skills. (Dkt. No. 59-2, Plaintiff's Opp to MSJ.)

### D.    Rulings Presented for Review

On August 7, 2023, the district court issued an order granting Calvary's motion for summary judgment. (Dkt. No. 63, Order.) The district court properly held that C.B. was "disabled" within the meaning of the Rehabilitation Act and that the relationship between Ms. Bryant and Calvary was contractual for purposes of Section 1981. (*Id.* at 9-11, 15.) Nonetheless, the district court ultimately granted Calvary's summary judgment motion based on several erroneous premises. The following rulings are presented for review:

1) On the Rehabilitation Act claim, the district court held that the school was not required to alter its disciplinary policies to accommodate a student with behavioral issues, and that the court could not second-guess a school's disciplinary decisions. (*Id.* at 11-14.)

2) On the Section 1981 claim, the district court first held that there was no direct evidence of discriminatory intent and then proceeded to apply the "*McDonnell Douglas*" burden-shifting framework. The court held that Ms. Bryant had not met her burden of proving a prima facie case under that framework

12

because she did not identify a specific "comparator" student who was treated better under similar circumstance.

3) The district court also held that even if she had made out a prima facie case, the school had provided legitimate and non-pretextual reasons for disciplining C.B.—his behavioral outbursts and Ms. Bryant's failure to obtain therapy for C.B. (*Id.* at 14-21.)

4) On the Title VI hostile environment claim, the district court held that the claim failed because the racially hostile acts identified by Ms. Bryant did not "effectively den[y] C.B. equal access to education." (*Id.* at 21-24.)

### E.    Standard of Review

This Court reviews a grant of summary judgment "de novo," meaning the Court applies "the same legal standards as the district court without deference to its decision. Summary judgment is proper only if the evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 753–54 (11th Cir. 2023) (citations and punctuation omitted).

The party opposing summary judgment need not prove that the evidence definitively points in her direction—rather, as long as the opposing party has "presented some evidence" that would support a jury verdict in her favor, "[t]his is enough to survive a motion for summary judgment." *May v. Nygard Holdings Ltd.*,

203 F. App'x 949, 951 (11th Cir. 2006) (citations omitted); *Thompson v. Metro.*

*Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991) (same).

"Credibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge."

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)

(quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000).

## SUMMARY OF THE ARGUMENT

This appeal arises from the district court's erroneous grant of summary

judgment to the defendant school on a mother's claims of disability discrimination

and racial discrimination on behalf of her son.

At the heart of this case is C.B., a teenaged boy with diagnosed disabilities,

including autism and ADHD. When he was eleven, his mother, Ms. Bryant,

enrolled him at Calvary Christian School of Columbus, Georgia, Inc. ("Calvary").

During his first year, C.B. seemed to be doing well. In his second year, however—

perhaps partly in response to being subject to an environment of increasing racial

harassment from other students as well as a discriminatory attitude from staff—

C.B.'s disabilities occasionally included mild behavioral manifestations, such as

throwing or slamming objects in the classroom. C.B.'s official record shows just

three such incidents. No one was ever hurt in these incidents, and indeed all parties

agree that C.B. never intended to harm another person. There is also no evidence in the record that the objects themselves were permanently damaged.

C.B.'s mother (the plaintiff, Ms. Bryant) sought out the assistance of an experienced behavioral analyst who developed a plan to treat C.B.'s behavioral outbursts through a short round of in-class monitoring and guidance. The plan was covered by insurance and would have cost the school nothing. Nonetheless, Calvary decided first to force C.B. out of the classroom (relegating him to remote learning) and then out of the school altogether.

This was in violation of Section 504 of the federal Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). C.B. is, without question, a child with a disability, and he is "otherwise qualified" because his behavioral manifestations can be controlled with the reasonable accommodation of some in-class therapy (provided at no cost to the school).

Racial discrimination, in violation of Title VI of the Civil Rights Act and 42 U.S.C. § 1981, also played a role here. C.B. is black. C.B.'s mother observed C.B.'s teacher, Ms. Cameron, treating C.B. differently from other students, ignoring him, and patronizing him. Moreover, during the tense electoral period in

2020, C.B.'s fellow students engaged in repeated racial harassment of black students, engaging in frequent racial comments and telling C.B., for example, that God hates black people. When C.B.'s mother complained, the school refused to investigate or discipline those students. And when C.B., in this stressful environment, experienced some behavioral issues arising from his disabilities, school staff wildly overreacted in a way that can only be described as highly racialized, suggesting that C.B. was a future criminal and that they were afraid for their lives. C.B. was twelve at the time.

C.B.'s mother brought disability and race discrimination claims on his behalf. At summary judgment, the district court granted Calvary's motion in its entirety, holding that Ms. Bryant could not show C.B. was entitled to a reasonable accommodation because the court believed it was required to defer to school administrators on disciplinary matters; that Ms. Bryant had failed to make out a prima facie case of race discrimination because she did not identify a similarly-situated white "comparator" student and that the school had legitimate reasons for its behavior; and that the hostile environment claim failed because, while there were offensive acts, they were not "severe" or "pervasive" enough to warrant relief.

Each of these holdings was in error. The district court should not have deferred to administrators on the reasonable accommodation question, which is for

16

the jury. Ms. Bryant does not need to make out *McDonnel-Douglas*'s prima facie case or identify a comparator where she can present (and has presented) a "convincing mosaic" of facts demonstrating discrimination by the school. Ms. Bryant presented copious evidence from which a reasonable jury could conclude the school's proffered reasons for expelling C.B. were pretextual. And Ms. Bryant provided sufficient evidence to allow a reasonable jury to conclude that the discrimination at Calvary was pervasive and severe, that officials did nothing about it even when directly informed about it, and that the hostile environment impacted C.B.'s education by exacerbating his disabilities.

This Court should grant the appeal and reverse the grant of summary judgment. The case should be tried on the facts.

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.  DISABILITY DISCRIMINATION

Genuine disputes of material fact preclude summary judgment as to the Rehabilitation Act claim. Ms. Bryant has introduced a great quantity of evidence into the record that C.B. has "disabilities" within the meaning of the statute and that he was or could have been a "qualified student" because there were reasonable accommodations available to ameliorate the behavioral manifestations of his disabilities: to wit, free, readily available in-classroom behavioral therapy. This is evidence that could allow a reasonable jury to find in Ms. Bryant's favor.

## A.    The District Court Correctly Found That C.B. Has a Disability

The district court correctly held that a reasonable factfinder could conclude that C.B. has a disability and that Calvary believed him to have a disability evaluation while he was within their care.

For purposes of nondiscrimination in federally-funded programs, the Rehabilitation Act adopts the Americans with Disabilities Act's definitions of "disability" and "individual with a disability." 29 U.S.C. §§ 705(9)(B), (20)(B) (adopting the definitions found at 42 U.S.C. § 12102(1)(A) for purposes of subchapter V of the Rehabilitation Act). Those definitions have two components relevant here. First, a "disability" is a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Second, one can have a "disability" for nondiscrimination purposes of the statute if he is "regarded as having such an impairment" by the defendant.

As the court noted, an independent psychiatric evaluation "determined that C.B. had ADHD and low-level autism because, among other things, he presented with 'symptoms of inattention and hyperactivity' and had difficulty with 'maintaining reciprocal social interaction.'" (Dkt. No. 63, Order at 10 (citing Dkt. No. 60-24 (psychiatrist's evaluation)).) This evidence precludes summary judgment on the issue of the existence of a disability.

The district court also correctly found that, at the very least, a reasonable factfinder could conclude that "Calvary regarded C.B. as having a disability," noting that "undisputed evidence shows that Calvary repeatedly encouraged Bryant to have C.B. evaluated for medication to enable him to 'focus and cooperate' in the classroom." (Dkt. No. 63, Order at 10-11.) That Calvary wanted C.B.'s mother to look into having him medicated shows that Calvary thought the root of C.B.'s disputed behavior was a disability.

The district court thus correctly determined that a jury could find C.B. was an individual with a disability for purposes of his statutory claims.

## B.    The District Court Erred in Its Analysis of Whether C.B. Was an "Otherwise Qualified" Student

The district court erred because it did not allow the question of whether C.B. was an "otherwise qualified" student go to a jury. Specifically, the jury, not the court, should have been the one to determine whether C.B. could have met the school's behavioral requirements with reasonable accommodations.

### 1.    Determining Whether Bryant's Requested Accommodations Were Reasonable Is Province of Jury

Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. §

794(a). Thus, to bring a claim under the Act, a plaintiff must be "otherwise qualified" to participate in the program. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("*Davis I*").

A critical part of the "otherwise-qualified" inquiry is "for the court to evaluate . . . whether the [school] could reasonably accommodate the [student]." *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 288 (1987). This is because a student is "otherwise qualified" if they can meet the school's requirements with accommodation. *Goldberg v. Fla. Int'l Univ*., 838 F. App'x 487, 492 (11th Cir. 2020) (in academic context "an otherwise qualified individual is a person who can meet the program's academic standards, with or without accommodations"). As the Fifth Circuit has noted,  "the phrase 'otherwise qualified' . . . cannot refer only to those **already** capable of meeting *all* the requirements—or else no reasonable requirement could ever violate § 504, no matter how easy it would be to accommodate handicapped individuals who cannot fulfill it." *Brennan v. Stewart*, 834 F.2d 1248, 1261–62 (5th Cir. 1988) (first emphasis added).

The reasonable accommodation inquiry is "fact-intensive and focuses on whether the costs and other burdens imposed by the proposed modification to an existing program amount to reasonable accommodation of the handicapped or a substantial modification of the program." *Freeman v. Cavazos*, 939 F.2d 1527,

1532 (11th Cir. 1991); *see also Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th

Cir. 2001) ("Whether a requested accommodation is reasonable is highly fact-

specific, and determined on a case-by-case basis by balancing the cost to the

defendant and the benefit to the plaintiff.").

Such a fact-intensive balancing is, of course, the province of the jury, as

both other circuits and the district courts of this circuit have frequently recognized.

*Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 615 (3d Cir. 2006) ("In sum, the

question of whether Turner can perform the essential functions of her position with

reasonable accommodation is an issue for the jury."); *Chisolm v. McManimon*, 275

F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or

services is a question of fact precluding summary judgment."); *McGregor v.*

*Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 855 (5th Cir. 1993) (because

"whether the accommodations are reasonable" is a question of fact, summary

judgment appropriate "only if reasonable [people] could not differ"); *Saulter v.*

*Corizon Health, Inc.*, No. 5:16-CV-333-MCR-GRJ, 2018 WL 11491441, at *6

(N.D. Fla. Mar. 26, 2018) ("Whether an accommodation is 'reasonable' is

ordinarily not appropriate for resolution on summary judgment.") (quotation marks

omitted); *Wolfe v. Fla. Dep't of Corr.*, No. 5:10-CV-663-OC-PRL, 2012 WL

4052334, at *4 (M.D. Fla. Sept. 14, 2012) (same); *see also Dadian*, 269 F.3d at

21

838 (declining to disturb jury determination of whether the defendant failed to make a reasonable accommodation for the plaintiffs' disabilities).

Thus, where there is a fact issue as to whether a disability could have been reasonably accommodated, it is "error for the district court to [take] this issue away from the fact-finder." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 (11th Cir. 2007) (reversing summary judgment where record showed fact issue regarding whether employee's proposed alternative schedule was reasonable accommodation).

Here, Ms. Bryant sought a reasonable accommodation to ameliorate the behavioral effects of her son's disability. C.B., as a result of his disabilities,[2] had a handful of outbursts in class in which he threw or slammed down objects. C.B. never hurt anyone with these actions, and all the evidence in the record shows that he never directed his outbursts at any person. To deal with these occasional behavioral issues—as the school *asked her to do* (Dkt. No. 49-2, Koan Decl. ¶ 17), and on the understanding that C.B. would be returning to class (Dkt. No. 59-40, Aff. J. Bryant ¶ 40)—Ms. Bryant consulted board-certified behavior analyst Kya

---

[2] It is not seriously disputed that C.B.'s behavioral issues are tied to and the result of his disability, but to be clear, the professional evaluations support this. (Dkt. No. 60-24, Weis Report at 4 (noting "[C.B.]'s flat affect, difficulty with eye contact, difficulty with flexibility in responses, as well as the quality of his social responses and social overtures all suggest he experiences some difficulty with maintaining reciprocal social interaction"); *id.* at 5 (noting "indicators of impulsivity" and "indicators of sustained attention difficulty"); Dkt. No. 50-1, Williams Depo. at 169:2-170:6 (discussing C.B.'s behavioral difficulties in the context of children with autism, who "may be very rigid," and noting C.B.'s "deficits" in the ability to transition activities); Dkt. No. 60-3, Williams Report at 6 (noting C.B. displays avoidance around transitioning to new tasks, and therapist's questions about C.B.'s "feelings, views on school, and complex social concepts evoked problem behaviors"); *id.* at 7 (C.B. struggles to sit still for more than ~5 minutes when doing "non-preferred" tasks).)

Williams. Ms. Williams created a plan to provide C.B. applied behavioral analysis ("ABA") services in the classroom setting, "such as assistance in de-escalation and behavioral therapy." (Dkt. No. 50-1, Williams Depo. Tr. at 78:1-79:7; Aff. J. Bryant ¶ 45.) Ms. Williams offered Calvary "her in-school services free of charge." (*Id.*)

Nothing in the record suggests that C.B. could not be trained to control and redirect such outbursts, and Ms. Williams' professional opinion was that he could. (Dkt. No. 60-3, Williams Report at 14 (identifying "goals of treatment" to include reducing "maladaptive behaviors such as property destruction" and increasing "adaptive" skills); Dkt. No. 60-4, Williams Letter of Support at 1 (expressing opinion that "with adult support [C.B.] would be able to return to in person school").) The District Court made no particular findings, and cited no evidence, that a return to class *with a trained behavioral therapist* would have posed any risk of either disruption or danger to other students. Indeed, the District Court did not even cite facts in the record showing that such a controlled return to class would have resulted in any additional infractions of the school's policies.

Moreover, Ms. Bryant's insurer was willing to pay for the recommended 15 hours of in-school one-to-one assistance by a therapist and authorized six months of assistance and evaluation. (Dkt. No. 50-1, Williams Depo. Tr. at 207.) Thus, there would have been no financial burden to the school. And the intervention was

time-limited: Ms. Williams testified that her team had methods for minimizing disruption and that they could "fade" the ABA interventions over time, leaving CB able to function independently. (*Id.* at 203-204.) Thus, there was a great deal of evidence in the record to show that the requested accommodation was reasonable, minimally burdensome, and potentially effective.

In light of that evidence, Calvary did not and could not carry the heavy burden of showing that Bryant's proposed accommodations were unreasonable as a matter of law—i.e., as the *McGregor* court put it, so patently unreasonable that "reasonable [people] could not differ." 3 F.3d at 855. Thus the district court erred in granting summary judgment.

### 2. School Administrators' Disciplinary Decisions Are Not Exempt from the Requirements of Disability Law

Nonetheless, The District Court reasoned that when Calvary expelled C.B., it was merely disciplining C.B. according to its policies. The court concluded that Calvary need not accept C.B.'s proposed accommodation because Calvary was not required to make substantial modifications to its disciplinary program in order to accommodate CB, citing *Davis I*. (Dkt. No. 63, Order at 11-13, citing 442 U.S. at 413.)

That was error. *Davis I* itself noted that "situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory." 442 U.S. at 412–13 (1979). That prediction was borne out in this Court's

subsequent cases, which have long required a program provider to make changes to its programs where the program has the effect of excluding a disabled person who might be able to perform with reasonable accommodation. *Stutts v. Freeman*, 694 F.2d 666, 669 (11th Cir. 1983) (when employer uses employment test that could not "accurately reflect the abilities of a handicapped person, as a matter of law **they must do more** to accommodate that individual") (emphasis added).

This is true even where one manifestation of the disability is unacceptable behavior, as long as the behavior could be corrected with accommodation. *See, e.g., Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1226–27 (11th Cir. 2016) (plaintiff properly pled reasonable accommodation claim against housing provider where an "accommodation was necessary to eliminate the possibility that [plaintiff] would make perceived threats or engage in other behavior that frightened or disturbed . . . staff"). Thus, "[a] school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012); *C.B. v. Moreno Valley Unified Sch. Dist.*, No. EDCV210194JGBSPX, 2023 WL 8044361, at *15-16 (C.D. Cal. Oct. 13, 2023) (granting summary judgment to student plaintiff where school policy required resource officers "to treat all students the same and to

make no exceptions for disability-related behavior in their enforcement of school rules and regulations").

The district court did not attempt to determine whether a jury could find C.B.'s behavioral issues could be controlled with reasonable accommodation. It simply assumed that "Bryant's accommodation request can be properly characterized as a request for Calvary to exempt C.B. from its normal disciplinary policy," (Dkt. No. 63, Order at 12), and then declared that it would not "substitute its judgment for the disciplinary decisions of Calvary's administrators," citing *Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ("*Davis II*").

But *Davis II* had nothing to do with Section 504 or disability. Rather, in that case the Supreme Court held that schools could be held liable under Title IX for deliberate indifference to known sexual harassment of students by their peers. *Id* at 648. The dissent expressed a concern that this would give Title IX complainants the right to demand particular remedies in the course of school disciplinary proceedings, and to sue if they did not get them. *Id.* In that context, the Court instructed lower courts to "refrain from second-guessing the disciplinary decisions made by school administrators"—i.e., not to entertain a flood of demands for particular remedies under Title IX. Nothing in the case indicates that the Supreme Court intended to provide educators a *per se* immunity from making reasonable

accommodations to disabled students as long as they act under the aegis of "discipline."

On the contrary, in a case very much on point with this one, the Ninth Circuit held that a plaintiff was entitled to have a jury evaluate whether her proposed in-class behavioral modification plan was reasonable, based on expert testimony from a professional therapist:

> The district court dismissed this claim, noting that "[o]n the evidence presented, it cannot be assumed that if A.G. had been provided a Functional Behavior Assessment, a Behavior Intervention Plan, and a full-time behavioral aide, she would have had fewer behavior problems and would not have posed a danger to herself and others." **But this conclusion directly contradicts the conclusions of Dr. Ferro, whose report and testimony plaintiffs submitted in support of their reasonable accommodation claim.** Dr. Ferro stated that A.G.'s outbursts at Vista Verde "demonstrate[d] that AG needed the accommodations of an FBA and a BIP to have meaningful access to her education." Dr. Ferro's opinions were corroborated by evidence that A.G.'s classroom teacher believed that A.G. needed more behavioral support and that the teacher sought assistance to better meet A.G.'s needs. **This evidence creates an issue of material fact** as to whether accommodations, such as a personal behavioral aide, would have helped A.G. remain at Vista Verde.

*A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1206 (9th Cir. 2016).

The behavior in *A.G.* was much more severe than the behavior alleged here. In *A.G.* the child "refused to go to class, destroyed school property, threatened to harm herself, wrote graffiti on a bathroom wall, and was uncooperative with a school resource officer, eventually physically striking that officer." *A.G.*, 815 F.3d

27

at 1200. Nonetheless, the Ninth Circuit did not simply defer to "the disciplinary decisions of [the school]'s administrators." (Dkt. No. 63, Order at 14.) Rather, it was for the jury to decide whether accommodation—remaining within the classroom but with behavioral support—would have been reasonable. *A.G.*, 815 F.3d at 1206.

This is also not a case where the therapist-recommended accommodations have already been tried and failed. *Cf. W.H. ex rel. B.H. v. Clovis Unified Sch. Dist.*, No. CV F 08-0374 LJO DLB, 2009 WL 1605356, at *23 (E.D. Cal. June 8, 2009) (E.D. Cal. Sept. 10, 2009) (granting summary judgment where "multiple strategies" had failed); *Joseph M. v. Becker Coll.*, 531 F. Supp. 3d 383, 398 (D. Mass. 2021) (granting summary judgment where "[i]t is undisputed that Becker granted all academic accommodations requested by Joseph"). Rather, as Ms. Williams testified, "[t]here's so many different strategies and interventions and things that **we just didn't get to put in place** because he was denied access to the services in the school setting." (Dkt. No. 50-1, Williams Depo. Tr. at 204:11-14 (emphasis added).) And while the school claimed he had provided no evidence of progress, that too, is a contested issue—Ms. Williams testified that "[w]e were able to teach the socially appropriate behaviors we needed to teach in the clinic setting when he came to us." (*Id.* at 205:17-19.) Indeed, Ms. Williams' initial evaluation

of CB noted *zero* incidents of property destruction in the clinic setting during her evaluation. (*Id.*, Ex. 1 at 9.)

The District Court also erred in failing to consider evidence that, in fact, C.B. has been able to make progress with accommodations. Ms. Bryant put affidavits into the record from C.B.'s current teachers stating, among other things, that in a classroom where he was given tutoring and "sensory items" to assist with his ADHD, "C.B.'s behavior . . . over the last two and a half years has always been calm and nonaggressive. C.B. is not disruptive, plays well with his peers, and gets along with everyone at Sylvan. C.B. has not had any incidents of misbehavior in the last two and a half years of teaching of him." (Dkt. No. 59-43, Aff. J. Elver ¶¶ 11-12.) A reasonable jury could conclude from the evidence that, in fact, C.B. might have thrived at Calvary if Ms. Williams had been allowed to temporarily assist him in the classroom.

### 3.    Requiring Transfer to Another School Is Not Reasonable Accommodation

The District Court ultimately endorsed Calvary's requirement that Ms. Bryant and CB show "evidence of an improvement in his behavior" at a public school or some other institution *before* he could attempt an ABA accommodation in the classroom at Calvary. (Dkt. No. 63, Order at 14.) In other words, he would have had to try to use the ABA accommodation elsewhere before he could get the accommodation at Calvary. But that is not how anti-discrimination law works. A

school cannot absolve itself of responsibility to make reasonable accommodations by requiring a student to go to a different school instead.

Indeed, this Court warned, less than two years ago, of the danger that "antidiscrimination legislation" could be "emptied of its meaning through broad definitions of the program at issue." *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1303 (11th Cir. 2022). In *L.E.*, the district court erred by treating the "program at issue" as "education generally" rather than "in-person education." *Id*. Here the problem is similar—Calvary is attempting to paint its decisions as reasonable by arguing that Ms. Bryant and CB could have been equally well-served by trying the ABA-supported re-entry in *another program altogether*. But that is not what the law requires. Rather, when reasonable accommodations must be made, they must be "reasonable accommodations *in the grantee's program*." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled[.]").

The district court erred in not allowing the question of reasonable accommodation to go to the jury.

## II.    RACE DISCRIMINATION

As to the Section 1981 claim, Ms. Bryant has produced significant evidence showing that Calvary staff were motivated by racial animus against C.B. and his mother, including teachers and staff treating him differently from other students; staff harassing C.B. and his mother in a racially-inflected way and making highly inappropriate remarks about C.B.'s future and the level of threat he posed in the classroom—remarks that bear no relationship to reality and can only be rooted in stereotypes. Ms. Bryant likewise produced a great deal of evidence that Calvary's alleged reasons for their behavior were pretextual.

### A.    The District Court Correctly Held Ms. Bryant and Calvary Were in a Contractual Relationship

Ms. Bryant entered into a contractual relationship with Calvary on behalf of her son. As the district court correctly held, "Section 1981 prohibits race discrimination 'in the making and enforcement of public and private contracts,' including contractual relationships between a private school and a student and his parents." (Dkt. No. 63, Order at 15.) That relationship was impaired to the extent that Calvary failed to provide the education it was legally required to—one free of racial discrimination. Thus, the question at issue here is whether there was evidence in the record from which a reasonable jury could conclude that Calvary discriminated against C.B. on the basis of race.

31

### B.    The District Court Erred in Finding No Direct Evidence of Race Discrimination

The district court erred in applying the *McDonnell-Douglas* burden-shifting framework to this case. That framework only applies where there is a lack of direct evidence of discriminatory intent and such intent must be inferred. "When a plaintiff proves a case of discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate[.]" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 922 (11th Cir. 2018). Indeed, "[w]here the non-movant presents direct evidence . . . summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997).

This Court has defined "direct evidence as "evidence which reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by" the plaintiff. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Such evidence must be "blatant" to qualify as direct evidence. As the Seventh Circuit has noted, however, direct evidence need not be a literal statement that the official is taking an adverse action based on the protected characteristic:

> The most obvious and compelling example would be a remark  to the effect that "I won't hire you because you're a woman," or "I'm firing you because you're not a Christian." But the evidence need not be this obvious to qualify as direct evidence . . . [R]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate

employees based on illegal criteria will suffice as direct evidence of
discrimination even if the evidence stops short of a virtual admission
of illegality. Proof of this nature supports the inference that a
statutorily proscribed factor—race, sex, age, or in this case, religion—
was at least a motivating factor in the adverse employment action at
issue.

*Venters v. City of Delphi*, 123 F.3d 956, 972–73 (7th Cir. 1997).

The bottom line is simply that the evidence must show the "authority's
racially discriminatory attitudes, regardless of whether it relates to the [adverse]
decision at issue." *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 n.9
(11th Cir. 1990). Moreover, the statements that provide the direct evidence of
animus can be few in number. In *Thompkins v. Morris Brown Coll.*, 752 F.2d 558,
561 (11th Cir. 1985), for example, the plaintiff proffered just "two statements" by
administrators showing sexist animus; on that evidence, this Court held that
application of *McDonnell Douglas* was error.

Ms. Bryant provided the district court direct evidence of racial hostility—
most notably, Ms. Jones' statements that C.B. would end up "with his hands
behind his back" (i.e., in handcuffs) and that school officials were "now afraid for
our lives." (Dkt. No. 49-3, Bryant Depo. Tr. at 287:7-11.) These statements, made
in the context of discussing C.B. and the school's discipline of him, are so over-
the-top and out of line with what actually happened (minor abuse of classroom
objects by a disabled child) that they can *only* be understood through the stereotype
of young black men as dangerous and likely to lead lives of criminality. Thus, they

33

qualify as "blatant" evidence of discriminatory attitudes, and therefore direct evidence.

The district court therefore erred in granting summary judgment.

### C.    The District Court Erred in Rigidly Applying *McDonnell Douglas* to the Evidence of Race Discrimination

Because the district court erroneously concluded there was no direct evidence of discriminatory intent, it applied the "burden-shifting" framework first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"). But it was error to consider the evidence only through that framework in evaluating a summary judgment motion, and under the correct standard Ms. Bryant's claim must survive for trial.

Under the *McDonnell Douglas* framework, in order to qualify for a rebuttable presumption of discrimination based on indirect evidence, a plaintiff alleging a claim under 42 U.S.C. § 1981[3] "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination . . . . The burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for" the defendant's complained-of actions. *Id.* at 802-803. The plaintiff is then "afforded a fair opportunity to demonstrate that petitioner's assigned reason

---

[3] *McDonnell Douglas* was brought under Title VII, but "[t]he elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim." *Rice–Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir.2000).

for refusing to re-employ was a pretext or discriminatory in its application." *Id.* at 807.

The district court applied a four-part test to address the first step, the "prima facie case": "Bryant must show that (1) C.B. is a member of a protected class, (2) he suffered an adverse action, (3) he was qualified to attend Calvary within the meaning of § 1981, and (4) Calvary treated similarly situated students outside his class more favorably." (Order at 16 (punctuation omitted) (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21(11th Cir. 2019) (en banc)).) The district court correctly noted that the first three elements were not in dispute. (Order at 17.) Rather, Calvary disputed, and the Court based its decision on, just one element of the *McDonnell Douglas* "prima facie case"—whether Ms. Bryant had come forward with an appropriate "comparator," i.e., a similarly situated student who was treated differently. (*Id.*)

But, first, even under the *McDonnell Douglas* framework, the district court erred in granting summary judgment for lack of a prima facie case. Where, as here, "the defendant . . . offers evidence of the reason for its actions toward the plaintiff, the presumption of discrimination created by the prima facie case simply drops out of the picture." *Tynes*, 88 F.4th at 945 (punctuation omitted). Thus, the analysis would simply proceed to the issue of pretext. (See Part II.D., *infra*, for pretext arguments.)

35

Second, a prima facie case under the *McDonnell Douglas* factors "is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). Specifically, "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff **will always survive summary judgment** if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (emphasis added).

Indeed, the *McDonnell Douglas* burden-shifting framework is not actually necessary to a summary judgment motion in a discrimination case; it is simply a procedural tool. *Tynes*, 88 F.4th at 944. It creates a "legally mandatory, rebuttable presumption" that the employer must respond to or be held liable. *Id.* at 945. But a plaintiff can still proceed without the benefit of that presumption. And the "prima facie case" is not intended to be the minimum threshold of "evidence for a plaintiff to prevail on a particular claim." *Id.*

Rather, "[a] plaintiff who cannot satisfy [the *McDonnell Douglas*] framework may still be able to prove her case with . . . **a convincing mosaic of circumstantial evidence** that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 946 (punctuation omitted) (emphasis added); *see also Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 (11th Cir. 2019)

36

(same). The summary judgment standard for discrimination cases is "simply enough evidence for a reasonable factfinder to infer intentional discrimination." *Tynes*, 88 F.4th at 946. "It is no different than the standards we ordinarily apply in deciding summary judgment and post-trial motions." *Id*.

Under the correct standard, Ms. Bryant survives summary judgment. She has put forward, at a minimum, a "convincing mosaic" of evidence of discriminatory intent. As the Court observed in *Tynes*, a "plaintiff proving her case through the convincing mosaic standard may point to any relevant and admissible evidence . . . . Evidence that is likely to be probative is evidence that demonstrates, **among other things**, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated [students], and (3) pretext." 88 F.4th at 947 n.2 (quotation marks omitted) (emphasis added). Ms. Bryant raised numerous such pieces of evidence below, including a pattern of indifference to racial hostility and harassment by the students; better (or more lenient) treatment of white students; statements and actions by staff that are *at least* ambiguous in their racial inflections; disregard for the school's own written policies when it came to C.B.; and the use of pretexts to cover for these behaviors.

Ms. Bryant put forward a laundry list of evidence of this type, including the following:

- Ms. Bryant witnessed staff, including C.B.'s teacher, Ms. Cameron, treating him differently from other students, including by ignoring him, speaking slowly to him, answering questions for other students differently, needling him about taking medication, and telling him "We're afraid of you." (Dkt. No. 49-3, Bryant Depo. Tr. at 283:16-284:22.);

- White children who made "racial comments" during virtual learning (directly seen by Ms. Bryant) were not disciplined. (*Id.* at 308:19-309:4.)

- Ms. Bryant asked the school to investigate vile racial remarks made by other students; the school refused. (*Id.* at 294:17-302:10.)

- White students received notification of the results of soccer tryouts, while C.B. did not. (*Id.* at 311:6-312:24.)

- Inappropriate intrusion of personal space and sarcastic commentary on C.B.'s progress by Ms. Cameron. (*Id.* at 285:16-24.)

- Ms. Smith made racially patronizing comments to Ms. Bryant. (*Id.* at 289:16-290:3.)

- Jones' statement about ending up with his hands behind his back and that staff were "afraid for [their] lives." (*Id.* at 287:7-11.)

(*And see generally* Dkt. No. 59-40, Aff. J Bryant.)

This mosaic of evidence is more than enough to cross the summary judgment threshold. A jury can and should make credibility determinations and assign proper weight to that evidence at trial. *Cleveland*, 369 F.3d at 1193.

### D.    A Jury Could Find Calvary's "Discipline" Explanations Pretextual

Ms. Bryant's claim also survives because there is significant evidence in the record that Calvary's proffered explanation for its behavior toward C.B.—the need for "discipline"—is merely pretext for discrimination.

To show pretext, a plaintiff points out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Even apart from the school's departure from its own policies described above, numerous facts could lead a reasonable jury to conclude that Calvary's proffered explanations are "unworthy of credence" and that animus, not discipline, was the true motive in expelling C.B.

For example, while Mr. Koan now says that Calvary considered C.B.'s outbursts with small classroom items "unsafe," (Dkt. No. 49-2, Koan Decl. ¶ 22(i)), it is completely undisputed that C.B. never "directed or aim[ed]" the objects at anyone. (Dkt. No. 49-5, Cameron Depo. Tr. at 21:18-22:13.) Plaintiff's behavioral analyst, Ms. Williams, noted that "when [C.B.] threw the items, he threw the items towards the floor. He did not throw them high enough up in the air where they could harm another student." (Dkt. No. 50-1, Depo. Tr. of Kya Williams at 190:15-18.) She also found that "he's easily redirected" away from potentially harmful behavior, (*id*. at 191:2-7), an observation borne out by his subsequent history at Sylvan Learning Academy. (Dkt. No. 59-43, Aff. of Julie Elver ¶¶ 11-12.) A reasonable jury could find that there was no real unsafety here:

only staff whose reactions to C.B.—"afraid for our lives" (Dkt. No. 49-3, Bryant Depo. Tr. at 287:7-11)—were racially charged and wildly ungrounded in reality.

A reasonable jury could also infer that the school's explanations are pretextual from the fact that Calvary disregarded its own written procedures on expulsion when it came to C.B. As the district court noted (Dkt. No. 63, Order at 20), Calvary's own handbook sets specific standards for expulsion. Those standards require that the student must have "demonstrated **persistent** or **significant** discipline problems." (Dkt. No. 59-5, Calvary 2020-2021 Student Handbook at 16 (emphases added).) Calvary and the district court justified C.B.'s expulsion based on just three recorded incidents, none of which—by the admission of all involved—hurt another student or were ever intended to, and all of which were tied to his disability. (Dkt. No. 63, Order at 19-20.) A jury was entitled to look at that evidence and conclude that these events were neither "persistent" nor "significant." That Calvary was not following its own procedures as to this black child strongly suggests that the school was motivated, not by a desire for consistency in its application of discipline, but by racial animus. *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 893–94 (11th Cir. 2011) (company's disregard of its own hiring criteria to promote white employee over black was evidence jury could use to find discriminatory intent).

Mr. Koan also cites "C.B.'s significant acts of property destruction." (Dkt. No. 49-2, Koan Decl. ¶ 22(i).) But this is sleight-of-hand: "property destruction" is a *term of art* in clinical assessments of autism that does not necessarily mean anything was destroyed in a literal sense. Rather, it can mean, as relevant here, throwing or slamming objects, regardless of whether they are damaged. (Dkt. No. 50-1, Williams Depo. Tr. at 135:21-136:9.) Nothing in the record indicates any school property was actually destroyed. (Dkt. No. 49-5, Cameron Depo. Tr. at 23:23-24:9 (a calculator thrown by C.B. "came apart, but we were able to put it back together," and Cameron had no knowledge of any other objects being damaged).) A reasonable jury could conclude the acts recorded—the throwing of a pencil and a calculator and the slamming of a laptop—were not, in fact, "significant acts of property destruction" in the ordinary sense of that term.

Koan's further claim that C.B. exhibited "continued behavioral issues in virtual instruction following his suspension," (Dkt. No. 49-2, Koan Decl. ¶ 22(ii)), appears to be based solely on his testimony that "I received reports that he was frequently disengaged, watching other screens during instruction sessions" and "understood that he had missed a few required one-on-one sessions with Ms. Cameron." (*Id.* ¶ 16.) Even assuming these hearsay reports are admissible (and there is no reason they should be), the alleged incidents are so lacking in any detail (when, where, with whom, what screens, what meetings) that a reasonable jury

41

could easily find them not credible as a reason for expulsion. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1016 (11th Cir. 2023) (at the summary judgment stage, plaintiff only "needs to show that a reasonable jury **could disbelieve** [defendant's] nondiscriminatory reason") (emphasis added).

A reasonable jury could also find that the scant facts alleged by Mr. Koan describe extremely minor events, such as "watching other screens" or missing a meeting, that would not motivate a reasonable administrator to expel a student in the absence of discriminatory intent. Additionally, C.B.'s teachers themselves frequently missed meetings, suggesting that the demand for perfect discipline was selective and directed solely at C.B. (Dkt. No. 59-40, Aff. J. Bryant ¶¶ 50-51.) C.B.'s teacher also failed to send links for remote meetings on some occasions, which a jury could find meant that, at least some of the time, C.B.'s failure to attend was not his fault. (*Id.* ¶¶ 50-51.) A jury is entitled to consider whether these "continued behavioral issues," if there is any admissible evidence of them at all, really had anything to do with the decision to expel C.B., or whether they are merely post-hoc pretext.

Mr. Koan also says the decision to expel C.B. was based on "[Ms.] Bryant's refusal to have C.B. evaluated for potential medication needs" and "failure to enroll CB in an ABA therapy program that included a traditional classroom setting." (Dkt. No. 49-2, Koan Decl. ¶¶ 22(iii)-(iv).) This is perhaps the most

egregious example of pretext: Ms. Bryant testified that she *did* hire ABA

therapists, starting in October 2020. (Dkt. No. 59-40, Aff. of Jaketra Bryant ¶ 24

(Ms. Bryant contacted ABA therapists in October 2020 and began the application

process).) Those therapists created a plan to provide free services to support C.B.

in the classroom setting. (Dkt. No. 50-1, Williams Depo. Tr. at 78:1-79:7; Dkt. No.

59-40, Aff. of Jaketra Bryant ¶ 45.) It was *Mr. Koan* who flatly refused to provide

a classroom in which the ABA therapists could execute their plan. (Dkt. No. 49-2,

Koan Decl. ¶ 21;  A reasonable jury could find that Calvary's administrators

manufactured a situation to justify what they already intended to do—the very

definition of pretext.

In short, Ms. Bryant has put forward evidence that would support an

inference by a reasonable jury that the school administrators held a discriminatory

animus, were motivated by discriminatory purposes, and have proffered only

pretextual reasons for their expulsion of C.B.

## III.  CREATION OF A RACIALLY HOSTILE ENVIRONMENT

The evidence would also have allowed a reasonable jury to find for Ms.

Bryant on her claim that the school created a racially hostile environment.

Schools that receive federal funding can be held liable "where they are

deliberately indifferent to sexual harassment, of which they have actual

knowledge, that is so severe, pervasive, and objectively offensive that it can be

said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1284–85 (11th Cir. 2003). "Actual knowledge" here means knowledge by "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures." *Id.*

Calvary's responsible officials had the requisite knowledge. Ms. Bryant has testified that she tried to bring incidents of racial intolerance to the school's attention and that school administrators, including Smith and Jones, did nothing. (Dkt. No. 49-3, Bryant Depo. Tr. at 294:17-302:10.) Where a school has made "no effort whatsoever either to investigate or to put an end to the harassment," a jury may infer deliberate indifference to harassment. *Davis II*, 526 U.S. at 654.

As for whether the harassment was "severe, pervasive, and objectively offensive," the Fifth Circuit has noted that "the harassment must be more than the sort of teasing and bullying that generally takes place in schools," but that "being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (quotation marks omitted). Similarly, here, fellow students' open endorsement of the idea that "God hates blacks" goes far beyond normal schoolyard teasing.

Moreover, while cases like *Davis* and *Fennell* dealt purely with harassment by other students, here the evidence is that school *staff* also engaged in racially harassing behavior. Ms. Bryant and her mother, Brenda Bryant, have both testified that Ms. Cameron ignored and mistreated C.B. in the classroom. (Dkt. No. 59-40, Aff. J. Bryant ¶¶ 32, 35; Dkt. No. 59-41, Aff. B. Bryant ¶ 8.) Staff also engaged in what Ms. Bryant has perceived as "microaggressions," including behavior that is patronizing, overly physically familiar and intrusive, and reliant on ugly stereotypes of black criminality. Federal courts have repeatedly "recognize[d] that certain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness—words like 'welfare queen,' 'terrorist,' 'thug,' 'illegal alien.' Indeed, [anti-discrimination law] can hear racism sung in the [dog] whistle register." *Lloyd v. Holder*, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (collecting cases).

In its briefing below, Calvary disparaged the many events of racially hostile behavior as mere "microaggressions" that are "insufficient to support a hostile [educational] environment claim," citing *Chambers v. City of Lakeland*, No. 8:20-CV-2794-JLB-SPF, 2022 WL 2356816, at *11 (M.D. Fla. June 30, 2022). (Dkt. No. 49-10 at 9.) The district court does not appear to have depended on this argument. But, to address it briefly: first, in *Chambers* the primary reason for

summary judgment was that there was "**<u>no record evidence</u>**" of the circumstances of the microaggressions. 2022 WL 2356816 at *11. That is not the case here.

Second, courts routinely take evidence of microaggressions into account in hostile environment claims, because the inquiry is not about the magnitude of any individual event, but the totality of the environment. "If the combination of conduct sums up to be severe or pervasive, then it is enough . . . . Whether the sum comes from a large number of small incidents, or a small number of larger incidents, the result is the same." *Chen v. Yellen*, No. 3:14-CV-50164, 2021 WL 4226202, at *12, n.4 (N.D. Ill. Sept. 16, 2021), *aff'd*, No. 21-3110, 2023 WL 2967428 (7th Cir. Apr. 17, 2023). Thus, courts rely on even "micro" events as part of the total picture of the evidence. *Pena v. Clark Cnty.*, No. 3:21-CV-05411-DGE, 2023 WL 3293093, at *4 (W.D. Wash. May 5, 2023) (microaggression analysis by expert was "relevant to Plaintiffs' hostile work environment claims and to determining damages"); *Lockett v. Target Corp.*, No. 3:20-CV-00191 (SVN), 2022 WL 17127292, at *5 (D. Conn. Nov. 22, 2022) ("genuine issues of material fact as to Plaintiff's hostile work environment claim" included evidence of "microaggressions exhibited by Defendant's Store Team Leader"). Indeed, even the *Chambers* court initially allowed the plaintiff to amend her complaint to "explain the 'micro-aggressions' referenced" in her complaint. *Chambers v. City of Lakeland*, No. 8:20-CV-2794-TPB-SPF, 2021 WL 1428494, at *2 (M.D. Fla. Apr.

15, 2021). Only later, when the plaintiff failed to produce *record evidence* of the microaggressions at the summary judgment stage did the court conclude the claim could not survive.

Taking all these microaggressions together (as well the students' *macro*aggressions, and the school's refusal to do anything about them), a reasonable jury could find that discrimination at Calvary was severe, pervasive, and objectively offensive.

### A.    Interplay of Race and Disability.

The District Court also erred because it did not consider the evidence in the record showing that the racially intolerant environment at Calvary exacerbated the symptoms of his disability.

This Circuit has long allowed its district courts to entertain "an 'intersectional' theory of discrimination" wherein the plaintiff suffers discrimination unique to someone who "belongs simultaneously to two or more protected classes." *Harrington v. Cleburne Cnty. Bd. of Educ.*, 251 F.3d 935, 937 (11th Cir. 2001); *see also Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) ("We agree that discrimination against black females can exist even in the absence of discrimination against black men or white women."); *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1048 (10th Cir. 2020) ("We hold that sex-plus-age claims are cognizable under Title

47

VII."). Typically such a case involves a specific kind of prejudice that applies only to members of a group defined by two or more protected classes—for example, the "pernicious image of black men as sexual predators," which does not apply "with respect to men of other racial backgrounds or with respect to black women." *Harris v. Maricopa Cnty. Superior Ct.*, 631 F.3d 963, 977 (9th Cir. 2011).

But it is also possible for protected class categories to interact in a more subtle way. For example, in this case, the evidence shows that Calvary's staff reacted to the behavioral manifestations of C.B.'s disability in a way that they would not have if he had been a white child. They ascribed a future of criminality to C.B. and asserted they feared for their lives. This, in response to a 12-year-old child throwing a pencil.

Calvary also allowed a racially discriminatory environment to flourish, which, Ms. Bryant has argued (and marshaled evidence to show), actually helped *cause* the very behavior that Calvary disciplined C.B. for. Calvary argued to the district court that the racial hostility did not matter because C.B. "excelled academically, earning mostly As and Bs. There is nothing, then, to suggest that any teacher's 'microaggression' or any student's off-color remarks negatively affected his ability to perform academically." (Dkt. No. 49-10, Def's Memo at 10.) This argument is perverse in two ways. First, it essentially punishes C.B. for succeeding *despite* the hostile environment. Second, it completely ignores the impact of the

48

racially hostile environment on C.B.'s disabilities—which is the crux of this lawsuit.

That impact can be seen by comparing C.B.'s brief period of behavioral problems in fall 2020 (the period of "God hates blacks" and Ms. Cameron's negative treatment of C.B.) with his positive classroom record both before and after his experience of racial harassment. In the period before C.B. experienced racial hostility by both other students and his teacher, Ms. Cameron, "a positive behavior chart was implemented and positive changes were seen" in C.B.'s behavior in the 2019-2020 school year. (Aff. J. Bryant ¶ 13.) Under the care of teachers who were culturally sensitive and worked with C.B. on his accommodations, he appeared to achieve success, including positive reports from teachers, honor roll, and an award for good character. (*Id.* ¶¶ 14-15, 18, 21.)

After the period of harassment, when C.B. had been forced to pursue alternative schooling and finally obtained proper therapeutic assistant, C.B.'s classroom behavior was once again under control. "[O]ver the last two and a half years has always been calm and nonaggressive. C.B. is not disruptive, plays well with his peers, and gets along with everyone at Sylvan. C.B. has not had any incidents of misbehavior in the last two and a half years of teaching of him." (Aff. J. Elver ¶¶ 11-12.)

49

In short, Ms. Bryant's disability claim here is intersectional to, and deeply intertwined with, her allegations of racial discrimination and hostility. The hostile environment exacerbated C.B.'s disabilities, depriving him of the educational environment he was entitled to—including, ultimately, being excluded and then expelled from the school altogether.[4]

## **CONCLUSION**

As to each element of her claims, Ms. Bryant has presented evidence that would allow a reasonable jury to find in her favor. That is enough to create a genuine dispute of material fact and thus to survive a motion for summary judgment. *Thompson*, 934 F.2d at 1574. It is for a jury to decide whether the accommodation proposed by Ms. Bryant and Ms. Williams was reasonable and could have ameliorated the behavioral manifestations of C.B.'s disabilities. It is for a jury to decide whether the mosaic of evidence presented by Ms. Bryant adds up to racially discriminatory intent. It is for a jury to decide whether the events of racial harassment and hostility documented in this case are so objectively offensive as to alter the educational environment—especially in light of the apparent direct

---

[4] In any event, where a plaintiff's subjective experience of racial discrimination by defendant exacerbates or causes the plaintiff's disability, that experience is itself relevant *to his disability claim. McCray v. Westrock Servs., LLC*, No. CV219853DMGRAOX, 2023 WL 4681371, at *1 (C.D. Cal. July 12, 2023) (notwithstanding summary judgment on racial harassment claims, evidence of plaintiff's perception of racially discriminatory treatment would be admitted as relevant "to the root cause of his disability"). Regardless of whether Ms. Bryant succeeds on her race discrimination claims, she is entitled to present to the jury evidence that Calvary failed to reasonably accommodate C.B. by curbing the racialized reactions of staff and the racial harassment he was experiencing in the classroom.

effects on C.B.'s disabilities and his ability to meet the school's behavior standards.

The district court erred in taking these questions away from the jury and trying to answer them itself. The grant of summary judgment must be reversed.

DATED: July 22, 2024                    Respectfully submitted,

By: */s/ Rebecca Woods*
    Rebecca Woods
    Georgia Bar No. 942321
    rwoods@seyfarth.com
    Seth Fortin
    Georgia Bar No. 759830
    sfortin@seyfarth.com

    SEYFARTH SHAW LLP
    1075 Peachtree Street, N.E.
    Suite 2500
    Atlanta, Georgia 30309-3958
    Telephone: (404) 885-1500
    Facsimile: (404) 892-7056
    *Attorneys for Appellant Jaketra Bryant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,807 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point.

*/s/ Rebecca Woods*

Rebecca Woods
Attorney for Appellant

Dated: July 22, 2024

## <u>CERTIFICATE OF REDACTION</u>

I hereby certify that this brief contains references to certain confidential exhibits, which must be redacted. Pursuant to 11th Cir. R. 25-5, a separate motion to file under seal will be filed promptly.

*/s/ Rebecca Woods*
Rebecca Woods
Attorney for Appellant

Dated: July 22, 2024

## <u>CERTIFICATE OF VIRUS SCAN</u>

I hereby certify that this filing has been scanned for viruses using Trend Micro OfficeScan, Version 12, which was last updated on or about July 22, 2024, and, according to this program, is free of viruses.

*/s/ Rebecca Woods*
Rebecca Woods
Attorney for Appellant

Dated: July 22, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2024, I electronically filed the foregoing

Initial Brief of Appellant with the Clerk of the United States Court of Appeals for

the Eleventh Circuit using CM/ECF, which will cause it to be served upon

Defendant-Appellee through its counsel.

*/s/ Rebecca Woods*
Rebecca Woods
Attorney for Appellant

Dated: July 22, 2024